IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02887-PAB-KMT

U.S. COMMODITY FUTURES TRADING COMMISSION,

    Plaintiff,

v.

NICHOLAS TRIMBLE,
CAPSTONE QUANTITATIVE ANALYSIS, INC., and
BEEKEEPERS FUND CAPITAL MANAGEMENT, LLC,

    Defendants.

---

# ORDER

---

This matter is before the Court on the Motion for Preliminary Injunction [Docket No. 3] and the Motion to Supplement the Motion for Preliminary Injunction [Docket No. 39] filed by plaintiff U.S. Commodity Futures Trading Commission ("CFTC"). The CFTC seeks injunctive and other equitable relief against defendants Nicholas Trimble ("Trimble"), Capstone Quantitative Analysis, Inc. ("Capstone"), and Beekeepers Fund Capital Management, LLC ("BKFCM") for violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1 *et seq.*, as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")) §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C.

§§ 1 *et seq.*, and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et. seq*.

Specifically, the CFTC's complaint alleges that Trimble, as the principal agent for BKFCM and Capstone, traded off-exchange foreign currency contracts ("forex") in violation of the anti-fraud provisions of Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, 7 U.S.C. § 6b(a)(2)(A) and (C). Docket No. 1 at 15, ¶¶ 44-45. On November 8, 2011, this Court entered an *Ex Parte* Statutory Restraining Order prohibiting the withdrawal, transfer, removal, dissipation, concealment, or disposition of defendants' assets, prohibiting the destruction or prevention of the CFTC's access to defendants' books and records, along with other equitable relief. *See generally* Docket No. 8.

On August 30, 2012, the Court conducted a preliminary injunction hearing in which the CFTC presented evidence in support of its motion. Trimble did not appear at the hearing; however, a CFTC representative testified that she provided Trimble with notice of the hearing via email and sent Trimble notices by mail to his last known address. *See* Docket No. 70 at 3-4. In addition, a review of the docket indicates that Trimble was served with the summons and complaint [Docket No. 15-4] and all pleadings in support of the preliminary injunction [Docket Nos. 56, 57 certifying that copies of the Court's Orders were mailed to Trimble's last known address]. No representative of Capstone or BKFCM appeared at the hearing either. Trimble is the registered agent of Capstone. Trimble also organized BKFCM. Capstone and BKFCM had their principal places of business at Trimble's residence. Thus, both Capstone and BKFCM had notice of the preliminary injunction hearing. On February 3, 2012, the

Clerk of the Court entered default [Docket No. 26] against Capstone and BKFCM and a motion for default judgment is pending against Capstone and BKFCM [Docket No. 34].

## I. FINDINGS OF FACT

Based on the exhibits admitted at the preliminary injunction hearing and the offers of proof, the Court makes the following findings of fact and conclusions of law.

### A. Jurisdiction and Venue

1.	This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1 (2008), which allows the CFTC to seek injunctive relief against any person or entity whenever it shall appear that such person or entity has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

2.	Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Trimble is a resident of the State of Colorado, transacted business in this District, and certain transactions, acts, and practices in violation of the Act have occurred, are occurring, or are about occur within this District.

### B. The Parties

3.	Plaintiff CFTC is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of provisions of the Act, as amended, to be codified at 7 U.S.C. § 1 *et seq*., and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1. *et seq*. The CFTC has jurisdiction over this action pursuant to § 2(c)(2)(C) of the Act.

4.	Defendant Trimble resides in Denver, Colorado. Trimble is the registered

agent of Capstone and the founder and manager of BKFCM.  Trimble was a registered agent with the CFTC from September 19, 2007 until January 15, 2008, when his registration was voluntarily withdrawn.  Trimble has not been registered with the CFTC in any capacity since January 15, 2008.

5. Defendant Capstone is a Colorado corporation formed by Trimble on July 23, 2009.  Docket No. 63-1 at 33-36.  Capstone's principal place of business is in Denver, Colorado.  Capstone solicits customers to trade forex through a pooled account known as Beekeepers Fund, L.P. ("BKF") and/or through a managed account pursuant to a power of attorney using Capstone's allegedly complex trading software known as the Gladiator system.  Capstone also claims to have created, and to own, the Gladiator system.  Capstone has never been registered with the CFTC in any capacity.  Docket No. 63-1 at 43.

6. Defendant BKFCM is a Delaware limited liability company formed by Trimble on September 23, 2009.  Docket No. 63-1 at 31-32.  BKFCM's principal place of business is in Denver, Colorado.  BKFCM is the general partner of BKF and BKFCM has the exclusive right and authority to manage, operate and conduct BKF's business operations.  BKFCM has never been registered with the CFTC in any capacity.  Docket No. 63-1 at 44.

7. BKF is a Delaware limited partnership formed by Trimble on September 23, 2009.  Docket No. 63-1 at 26-28.  BKF's principal place of business is in Denver, Colorado.  BKF is a fund that accepts customer deposits for the purpose of pooling them to trade forex pursuant to the Gladiator system.  BKF is the limited partner of BKFCM.

### C. Solicitation Fraud

8.	Between July 2009 and August 2010, Trimble, individually and as the controlling agent of Capstone and BKFCM, solicited prospective investors to participate in a commodity pool ("pool") for the purpose of trading forex. Trimble told potential investors that he was raising money through a hedge fund called BKF and managed pooled accounts using the Gladiator system to trade forex.

9.	Trimble told investors that his company, Capstone, actively managed more than $5 million in forex trading accounts and owned the Gladiator System. He reported to potential investors that the Gladiator system was created by one of Capstone's computer programmers who formerly worked for the National Aeronautics and Space Administration ("NASA").

10.	According to Trimble, the Gladiator system was a "machine that print[ed] money" and consistently earned profits of at least 3% per month while limiting its market exposure. Trimble told prospective investors that an anonymous buyer placed a $20 million bid for the purchase of the Gladiator system but Capstone declined the offer because the Gladiator system was too valuable. Trimble also advised investors that Gain Capital Group, LLC, a Chicago based trading firm, agreed to invest $5 million in BKF to trade Forex using the Gladiator system.

11.	In September 2009, Trimble told James K. Harvey, another potential investor, about Capstone and the Gladiator system's ability to trade forex. Trimble told Harvey that he was soliciting participants willing to invest $250,000 but that participants with less than $250,000 could invest in BKF by pooling their money together in a separate entity. On September 25, 2009, at the suggestion of Trimble, Harvey formed

High Country Hedge, LLC ("HCH") to raise funds for the BKF pool. Docket No. 63-2 at 56-59. In an attempt to lure prospective pool participants to HCH, Harvey repeated Trimble's allegations about the Gladiator system and relayed to potential investors that Trimble was a successful trader who managed millions of dollars in forex trading accounts.

12. Harvey and Michael Sadjak, another investor in BKF, also purchased a share in BKFCM for $150,000 each. Harvey and Sadjak bought shares in Capstone because Trimble represented that BKFCM was a valuable company, which had an exclusive license for the Gladiator system.

13. In December 2009, Harvey told Trimble that he wanted to visit Capstone's office in Utah, where Trimble claimed the Gladiator system was located. Although Trimble knew that Capstone did not have an office in Utah, he nevertheless arranged for a web meeting to introduce Harvey to the Gladiator System. At this meeting, Josh Christensen, one of Trimble's acquaintances, pretended to be the head of technology at Capstone's office in Utah and answered Harvey's questions about the Gladiator system.

14. In late August 2010, a mutual acquaintance introduced Trimble to Jeffery Groendyke, the manager of the JG Forex Fund ("JGF"). Trimble represented to Groendyke that Capstone could recover any losses suffered by JGF while trading forex. Based on these representations, JGF through Groendyke invested $436,485 with Trimble and BKFCM.

15. Between September 2009 and January 2010, Trimble's representations

about the Gladiator system led public investors to invest $1,153,485 for the purpose of trading forex. Trimble kept these funds in a bank account at JP Morgan.

16. Throughout the relevant period, Trimble failed to disclose to investors and prospective investors that he had no experience trading forex prior to July 2009. Trimble did not disclose that his representations about the Gladiator system's consistent profits were false and unfounded. Trimble further failed to disclose that neither Capstone nor himself had created the Gladiator system for trading forex, the Gladiator system was not created by a former NASA employee, and Gain Capital had never promised to invest $5 million. Docket No. 63-3 at 41.

### D. Trimble's Forex Trading

17. In December 2009, Trimble opened an account at MIG Investments S.A. ("MIG"), a forex trading firm located in Neuchatel, Switzerland. That same month, Trimble transferred $408,000 from the BKF fund to the MIG bank account. Trimble then began trading and operating the BKF funds located in the MIG account. Trimble gave Harvey a password so that Harvey could review the trading account. The funds located at MIG were traded on a margined or leveraged basis with no obligation to take delivery.

18. On December 11, 2009, Trimble, as a signatory and owner of the BKF bank account, transferred $309,000 of the BKF funds into an account at OSIRIS FX, a forex trading firm located in Tortola, British Virgin Islands. On February 15, 2010, Trimble as the principal of Capstone and BKFCM began trading the account at OSIRIS FX using the Gladiator system. Docket No. 63-3 at 8. The funds located at OSIRIS were traded on a margined or leveraged basis with no obligation to take delivery.

19. On February 15, 2010, Harvey and Sadjak noticed from a review of account statements from MIG that the forex account had lost 47% of its value. Trimble explained to his investors that the losses were due to the poor performance of the Gladiator system. Despite the losses, Trimble continued to trade BKF's accounts at MIG and OSIRIS FX with the Gladiator system.

20. On March 30, 2010, Trimble asked Harvey and Sadjak if he could remove $120,000 from the MIG bank account to settle a tax bill he had received. Docket No. 63-3 at 11. On April 7, 2010, Trimble transferred $120,000 from the MIG bank account which was received in the BKF account and subsequently transferred into Trimble's account at TCF Bank.

21. Between April and May 2010, Sadjak and Harvey noticed that the forex accounts at both OSIRIS and MIG were performing poorly. By the end of May 2010, Harvey and Sadjak asked Trimble to cease trading the MIG and OSIRIS FX accounts and withdraw the remaining balance of $158,656 from both accounts. On June 25, 2010, MIG transferred $65,000 to the BKF bank account. On August 23, 2010, OSIRIS FX wired $80,000 to the BKF bank account, and another $8,007 on September 9, 2010. After removing the funds from the MIG and OSIRIS FX accounts, approximately $129,680 of the BKF pool funds were redistributed to its investors on a pro-rata basis, leaving a $36,639.21 balance. The balance of $36,639.21 was transferred to the HCH account.

### E. Trimble Misappropriated $446,149.21 of Investor Funds

22. In August 2010, Trimble met with HCH participants and suggested that they allow him to invest the remaining $36,639.21 in an attempt to recover the forex

trading losses.  To persuade HCH investors to allow him to invest the $36,639.21, Trimble offered to execute promissory notes with each HCH investor for the full amount of their investment due and payable on January 15, 2011.  The HCH investors allowed Trimble to trade the remaining balance to recover the Gladiator system's losses.  However, instead of investing the $36,639.21, Trimble used the funds for personal expenses including food, clothing, rent, and gambling.  As of the date of the hearing, Trimble has yet to repay any of the promissory notes or return any of the $36,639.21 to the HCH investors.

23.    Trimble also failed to trade the $436,485 accepted from Groendyke on forex accounts.  Of the $436,485 from Groendyke, Trimble deposited approximately $35,000 into Capstone's bank account in September 2010 and approximately $401,485 into the personal bank account of his wife, Jennifer Trimble (formerly known as Jennifer Geiss).  Trimble then spent $272,000 of the $401,485 from Mrs. Trimble's account on personal expenses, including travel, rent, dining, and gambling.  Trimble paid a law firm $18,600 for a purported real estate venture and returned $29,000 to Groendyke.  None of the funds provided by Groendyke were used to trade forex.

24.    Sometime in 2011, Sadjak created a blog to prevent Trimble from luring other investors.  In December 2001, Sadjak received a call from a woman who represented herself as Trimble's mother.  According to Sadjak, Trimble's mother apologized for her son's behavior and expressed remorse for the loss Sadjak had suffered.  Trimble's mother wanted to warn people before her son misappropriated more money from other individuals.

25. Sadjak also received a telephone call from a pastor in Michigan. The pastor told Sadjak that Trimble had taken investments from several members of his church and that his congregation had suffered large financial losses. According to the pastor, Trimble and Groendyke told members of his church that he owned a trading program called the Gladiator system that could earn billions. The pastor told Sadjak that none of the members of his church have been reimbursed for their losses.

26. Between July 2009 and December 2010, Trimble misappropriated $446,149.21 in connection with forex solicitations and transactions.

27. In July 2011, Trimble admitted to Harvey that: (1) Capstone did not own or create the Gladiator system; (2) Capstone never managed forex trading accounts for any other customers; (3) Capstone never managed a forex account that earned consistent profits of 3% per month; (4) Capstone does not have an office in Utah; (4) Christensen never worked for Capstone; (5) the trading system was not named the Gladiator system; and (6) Trimble bought the Gladiator system from Christensen off the internet.

## II. CONCLUSIONS OF LAW

### A. CFTC Jurisdiction

Under § 2(c)(2)(C), the CFTC can pursue an action involving forex transactions that are: (1) offered to or entered into with a person who is not an eligible contract participant ("ECP"); (2) offered to or entered into on a leveraged basis or financed by the offeror on a similar basis; and (3) do not result in delivery within two days or create an enforceable obligation to make or take delivery. 7 U.S.C. § 2(c)(2)(C). ECPs are

defined in 7 U.S.C. § 1a(18). The threshold necessary to qualify as an ECP is a combined net worth of $5,000,000 for a commodity pool or assets exceeding $10,000,000 for an organization. The Commodity Futures Trading Commission has jurisdiction over Trimble's forex transactions because Trimble, Capstone, and BKFCM were not ECPs under the Act. *See* 7 U.S.C. § 1a(18). Further, defendants' forex transactions were entered into on a leveraged or margined basis, meaning that BKF, through Mr. Trimble's trades as principal of BKF, was only required to provide a percentage of the value of the forex contracts purchased. Docket No. 70 at 43. Additionally, Trimble's forex transactions did not result in actual delivery of the contracts within two days or otherwise create an enforceable obligation to make or take delivery. Moreover, neither the counterparty to the transactions nor defendants are one of certain enumerated persons pursuant to 7 U.S.C. § 2(c)(2)(C)(i), (ii). Therefore, the Commodity Futures Trading Commission has jurisdiction over defendants' forex trading.

### B. Injunctive Relief

Section 6c(b) of the Act, 7 U.S.C. § 13a-1(b), provides in pertinent part that "[u]pon a proper showing, a . . . temporary injunction . . . shall be granted without bond." The injunctive relief contemplated in this portion of the Act is remedial in nature, designed to prevent injury to the public and to deter illegal conduct. *See Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979). As such, restrictive concepts ordinarily associated with private litigation – such as proof of irreparable injury or inadequacy of other remedies – are not applicable to injunctive relief pursuant to the Act. *Id*. Instead, to obtain injunctive relief under the Act a plaintiff

must show only two things: (1) that a violation of the Act has occurred; and (2) that there is a reasonable likelihood of future violations. *Id.*; *Commodity Futures Trading Comm'n v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (noting that the CFTC need not prove irreparable harm or the inadequacy of other remedies).

To determine the likelihood of future violations of the Act, a court must look to the totality of the circumstances, including whether the violations showed a knowledge of wrongdoing, were persistent and recurrent, occurred over a long span of time, and whether the circumstances indicate that defendant is in a position that makes future violations likely to occur. *Hunt*, 591 F.2d at 1220; *see also Commodity Futures Trading Comm'n v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1268-69 (D. Kan. 2003). Past misconduct does not require the conclusion that there is a likelihood of future misconduct; however, previous misconduct is suggestive of the likelihood of future violations. *See Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D. N. J. 1988) ("The likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing.") (citation omitted).

Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –

(A) to cheat or defraud or attempt to cheat or defraud the other person;

> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract . . .

7 U.S.C. § 6b(a)(2)(A)-(C). Sections 4b(a)(1)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), prohibit cheating, defrauding, and deception in connection with off-exchange foreign currency ("forex") transactions that occurred on or after June 18, 2008.

The CFTC has made a prima facie showing that Trimble violated the Act with the requisite scienter[1] when he made false material[2] statements to investors about the capacities of the Gladiator system, the fact that Capstone managed more than $5 million in forex trading accounts, and that Gain Capital had invested $5 million in BKF. The CFTC has also shown that Trimble intentionally misappropriated $446,149.21 of investor funds for personal use. In this instance, Trimble's conduct is in violation of

---

[1] The scienter element is established when an individual's conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that defendant must have been aware of the risk. *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002).

[2] A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R & W Tech. Serv. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000). Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 110 (2d Cir. 1986). Here, the representations that the Gladiator system consistently earned returns of 3% and that Gain Capital had promised to invest $5 million in the Gladiator system are representations of the sort that a reasonable investor would consider important when making a decision to invest.

Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, 7 U.S.C. § 6b(a)(2)(A) and (C). In addition, Trimble violated the Act when he commingled participant funds with his personal account. *See* 17 C.F.R. § 4.20(c).

Capstone and BKFCM are liable as principals for the acts of their agent Trimble. Under § 2(a)(1)(B) of the Act, "[t]he act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. § 2(a)(1)(B). The facts set forth above demonstrate that, during the relevant period, Trimble acted as an agent of Capstone and BKFCM. Moreover, the acts, misrepresentations, omissions, and failures of Trimble described above occurred within the scope of his office as the founder, owner and president of Capstone and the founder, principal, and manager of BKFCM. Therefore, Capstone and BKFCM are liable for Trimble's acts, misrepresentations, omissions, and failures pursuant to § 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

Based on the foregoing, the Court finds that a preliminary injunction is appropriate in this case because defendants' previous conduct makes it likely that they could participate in future fraudulent activity in connection with forex trading.

Wherefore, it is

**ORDERED** that Plaintiff's Notice of Proposed Order and Motion for Entry of the Same [Docket No. 39] is **GRANTED**. It is further

**ORDERED** that Plaintiff's Motion for Preliminary Injunction [Docket No. 3] is **GRANTED**. It is further

**ORDERED** that defendants Nicholas Trimble, Capstone Quantitative Analysis, Inc. ("Capstone"), and Beekeepers Fund Capital Management, LLC ("BKFCM") are restrained, enjoined, and prohibited, until further order of the Court, from directly or indirectly:

- A. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a, including but not limited to trading for themselves or others;

- B. Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)) ("commodity options"), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their personal accounts or for any accounts in which they have a direct or indirect interest;

- C. Having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

- D. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

- E. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

- F. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

    G.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent of any person registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

It is further

**ORDERED** that defendants, and any person or entity acting in the capacity of agent or employee of defendants, are restrained and enjoined from directly or indirectly withdrawing, transferring, removing, dissipating, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, converting, or otherwise disposing of any funds, assets or other property of defendants, wherever located, including funds, property, or assets held outside the United States, except as ordered by the Court, to include the following:

    A.    Account number xxxxxx5496 in the name of Nicholas Trimble at TCF Bank located in Denver, Colorado;

    B.    Account number xxxxxxxx2637 in the name of Jessica Geiss, now known as Jessica Trimble, at U.S. Bank located in Denver, Colorado;

    C.    Account number xxxxx4732 in the name of Capstone Quantitative Analysis, Inc. at Bank of the West located in Denver, Colorado;

    D.    Account number xxxxx3181 in the name of Capstone Quantitative Analysis, Inc. at JPMorgan Chase located in Denver, Colorado;

    E.    Account number xxxxx2632 in the name of High Country Hedge, LLC at JPMorgan Chase located in Denver, Colorado;

    F.    Account number xxxxx8643 in the name of Beekeepers Fund, L.P. at JPMorgan Chase located in Denver, Colorado;

    G.    Account number xxxxx2830 in the name of Beekeepers Fund Capital Management, LLC at JPMorgan Chase located in Denver, Colorado;

    H.    All accounts in the name of Beekeepers Fund, L.P., at MIG Bank located in Neuchatel, Switzerland;

      I.      All accounts in the name of Nicholas Trimble at OSIRIS FX located in Tortola, British Virgin Islands;

      J.      All accounts in the name of Beekeepers Fund, L.P. at OSIRIS FX located in Tortola, British Virgin Islands; and

      K.      All accounts in the name of Capstone Quantitative Analysis, Inc. at OSIRIS FX located in Tortola, British Virgin Islands.

The assets affected by this paragraph include existing assets and assets acquired by defendants after the effective date of this Order, as well as accounts not specifically identified above. It is further

**ORDERED** that any firm, bank, financial or brokerage institution, futures commission merchant, corporation, partnership, association or other person or entity, which holds, controls, or maintains custody of any funds, securities, assets or other property of any kind of defendants, or has held, controlled, or maintained custody of any funds, securities, assets or other property of defendants, and who receives notice of this Order by any means, including personal service, facsimile, electronic mail, United Parcel Service and Federal Express or other commercial overnight service, shall:

      A.      Prohibit defendants and any other person from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such assets except as directed by further order of the Court;

      B.      Deny defendants and any other person access to any safe deposit box that is:

            1.      titled in the name of or maintained by defendants, either individually, jointly or in any other capacity, including safe deposit boxes titled in the name of or maintained by nominees of defendants; and/or

            2.      otherwise subject to the control of or access by defendants;

    C.    For any funds, securities or assets held pursuant to this Order in the name of the defendants, to maintain fixed values, convert all balances into U.S. dollars using the exchange rate in effect as of the date of this Order; and

    D.    Cooperate with all reasonable requests of the CFTC relating to implementation of this Order, including producing records related to defendants' accounts and defendants' businesses.

It is further

**ORDERED** that defendants, and any person, including officers, agents, servants, employees or attorneys, acting in concert or participation with defendants and who receives actual notice of this Order, shall allow the CFTC to inspect books, records, and other documents of defendants and their agents including, but not limited to, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.  It is further

**ORDERED** that defendants shall prepare, sign and file with the Court, within 30 days of the date of this Order, a complete and accurate accounting of all of defendants' assets and liabilities, including all funds defendants received from and paid to customers and pool participants and other persons in connection with all commodity futures, commodity options and/or forex transactions or purported commodity futures, commodity options and/or forex transactions, together with the names, mailing addresses, email addresses and telephone numbers of any such persons, for the period of July 1, 2009, to and including the date of such accounting.  It is further

**ORDERED** that defendants shall prepare, sign and file with the Court, within 30 days of the date of this Order, a complete and accurate accounting of all disbursements made for any purpose whatsoever of any funds received from participants and other persons in connection with all commodity futures, commodity options and/or forex transactions or purported commodity futures, commodity options and/or forex transactions, including but not limited to salaries, commissions, fees, loans and other disbursements of money and property of any kind, from July 1, 2009, to and including the date of such accounting.  It is further

**ORDERED** that defendants shall identify and provide to the Commission, within 30 days of the date of this Order, an accounting of all assets and property they currently maintain outside the United States, including but not limited to all funds on deposit in any financial or brokerage institution, retail foreign exchange dealer, bank, or savings and loan institution held by, under the control of, or in the name of defendants, whether maintained jointly or in any other capacity, and shall repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case.

DATED September 28, 2012.

                                        BY THE COURT:

                                        s/Philip A. Brimmer
                                        PHILIP A. BRIMMER
                                        United States District Judge