IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02887-PAB-KMT

U.S. COMMODITY FUTURES TRADING COMMISSION,

    Plaintiff,

v.

NICHOLAS TRIMBLE,
CAPSTONE QUANTITATIVE ANALYSIS, INC., and
BEEKEEPERS FUND CAPITAL MANAGEMENT, LLC,

    Defendants.

---

## ORDER

---

        This matter is before the Court on the Motion for Entry of Final Judgment by

Default [Docket No. 34] filed by plaintiff U.S. Commodity Futures Trading Commission

("CFTC") and the Motion to Modify Proposed Order [Docket No. 36] filed by James

Harvey.[1]  In its motion, the CFTC requests that the Court enter default judgment against

defendants Capstone Quantitative Analysis, Inc. ("Capstone") and Beekeepers Fund

Capital Management, LLC ("BKFCM") for violations of the Commodity Exchange Act

(the "Act"), 7 U.S.C. § 1 *et seq*., as amended by the Food, Conservation, and Energy

---

        [1]On July 31, 2012, James Harvey filed a Renewed Motion to Intervene [Docket
No. 53] arguing that he should be granted the right to intervene in this case.  Docket
No. 53 at 1-2.  The magistrate judge issued a Recommendation [Docket No. 80] that
the Court deny Mr. Harvey's motion to intervene.  The magistrate judge concluded that
Mr. Harvey did not have a "direct" or "substantial" interest in the litigation and that his
intervention would unnecessarily delay litigation.  Docket No. 80 at 8-9.  Mr. Harvey did
not object to the Recommendation.  On October 22, 2012, the Court accepted the
Recommendation.  *See* Docket No. 82.  In light of the Court's order accepting the
Recommendation, Mr. Harvey's motion to modify the final judgment is now moot.

Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008

("CRA")) §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-

Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"),

Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of

2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C.

§§ 1 *et seq.*, and the Commission Regulations ("Regulations") promulgated thereunder,

17 C.F.R. §§ 1.1 *et. seq.*[2]  Defendants have not responded to the CFTC's motion.[3]

    In order to obtain a judgment by default, a party must follow the two-step process

described in Federal Rule of Civil Procedure 55.  First, it must seek an entry of default

from the Clerk of the Court under Rule 55(a).  Second, after default has been entered

by the Clerk, the party must seek default judgment according to the strictures of Rule

55(b).  *See Williams v. Smithson*, 1995 WL 365988, at *1 (10th Cir. June 20, 1995)

(citing *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)).  In this case, the Clerk of

the Court entered default against Capstone and BKFCM on February 3, 2012, pursuant

---

[2]In this Order, defendants are Capstone Quantitative Analysis, Inc. ("Capstone") and Beekeepers Fund Capital Management, LLC ("BKFCM").  Because the CFTC does not seek a default judgment against Nicholas Trimble, this order will not apply to Trimble.

[3]On November 8, 2011, this Court entered an *Ex Parte* Statutory Restraining Order prohibiting the withdrawal, transfer, removal, dissipation, concealment, or disposition of defendants' assets, prohibiting the destruction or prevention of the CFTC's access to defendants' books and records, along with other equitable relief. *See generally* Docket No. 8.  On March 28, 2012, the CFTC filed a motion to supplement its motion for a preliminary injunction [Docket No. 39].  On August 30, 2012, the Court conducted a preliminary injunction hearing wherein the CFTC presented evidence.  Defendants did not attend the hearing.  After the close of evidence, the Court enjoined defendants from withdrawing, transferring, removing, dissipating, concealing, or disposing of their assets, and prohibiting the destruction or prevention of the CFTC's access to their books and records.  Docket No. 79 at 15-18.

to Fed. R. Civ. P. 55(a).  Docket No. 26.  The CFTC now seeks entry of judgment by default pursuant to Rule 55(b).

Capstone and BKFCM have not sought to set aside the Clerk's entry of default or otherwise attempted to participate in this litigation.  Defendants may not simply sit out the litigation without consequence.  *See Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444-45 (10th Cir. 1983) ("[A] workable system of justice requires that litigants not be free to appear at their pleasure.  We therefore must hold parties and their attorneys to a reasonably high standard of diligence in observing the courts' rules of procedure.  The threat of judgment by default serves as an incentive to meet this standard.").  One such consequence is that, upon the entry of default against defendant, the well-pleaded allegations in the complaint are deemed admitted.  *See Olcott*, 327 F.3d at 1125; *see also* 10A Charles Wright, Arthur Miller & Mary Kane, Federal Practice & Procedure § 2688 (3d ed. 2010).  "Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  10A Wright & Miller § 2688, at 63.

## I.  BACKGROUND

The CFTC's complaint alleges that Nicholas Trimble ("Trimble"), as a principal and agent for BKFCM and Capstone, traded off-exchange foreign currency contracts ("forex") in violation of the anti-fraud provisions of Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, 7 U.S.C. § 6b(a)(2)(A) and (C).  Docket No. 1 at 15, ¶¶ 44-45.

## A.   Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1 (2008), which allows the CFTC to seek injunctive relief against any person or entity whenever it shall appear that such person or entity has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.  Docket No. 1 at 4, ¶ 9.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Trimble is a resident of the State of Colorado, transacted business in this District, and certain transactions, acts, and practices in violation of the Act have occurred, are occurring, or are about occur within this District.  Docket No. 1 at 4, ¶ 11.

## B.   The Parties

3.      Plaintiff CFTC is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of provisions of the Act, as amended, to be codified at 7 U.S.C. § 1 *et seq*., and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1. *et seq*.  The CFTC has jurisdiction over this action pursuant to § 2(c)(2)(C) of the Act.  Docket No. 1 at 4, ¶ 12.

4.      Defendant Capstone is a Colorado corporation formed by Trimble on July 23, 2009.  Docket No. 1 at 5, ¶ 14.  Capstone's principal place of business is in Denver, Colorado.  Capstone solicits customers to trade forex through a pooled account known as Beekeepers Fund, L.P. ("BKF") and/or through a managed account pursuant to a power of attorney using Capstone's allegedly complex trading software known as the

4

Gladiator system.  Capstone also claims to have created, and to own, the Gladiator system.  Capstone has never been registered with the CFTC in any capacity.

5.      Defendant BKFCM is a Delaware limited liability company formed by Trimble on September 23, 2009.  Docket No. 1 at 5-6, ¶ 15.  BKFCM's principal place of business is in Denver, Colorado.  BKFCM is the general partner of BKF and BKFCM has the exclusive right and authority to manage, operate, and conduct BKF's business operations.  BKFCM has never been registered with the CFTC in any capacity.

**C.   Related Parties**

6.      Defendant Trimble resides in Denver, Colorado.  Docket No. 1 at 5, ¶ 13. Trimble is the registered agent of Capstone and the founder and manager of BKFCM. Trimble was a registered agent with the CFTC from September 19, 2007 until January 15, 2008, when his registration was voluntarily withdrawn.  Trimble has not been registered with the CFTC in any capacity since January 15, 2008.

7.      BKF is a Delaware limited partnership formed by Trimble.  Docket No.1 at 6, ¶ 16.  BKF's principal place of business is in Denver, Colorado.  BKF is a fund that accepts and pools together customer deposits for the purpose of trading forex using the Gladiator system.  BKF is the limited partner of BKFCM.

8.      High Country Hedge, LLC ("HCH") is a Colorado limited liability corporation formed on September 25, 2009 by James K. Harvey ("Harvey"), one of the BKF pool participants.  Docket No. 1 at 6, ¶ 17.  HCH's principal place of business is in Parker, Colorado.  HCH was formed for the purpose of collecting investments to fund BKF and has never been registered with the CFTC in any capacity.

### D.   Solicitation Fraud

9.      In September 2009, Trimble told Harvey, a potential investor, about

Capstone and the Gladiator system's ability to trade forex.  Docket No. 1 at 9, ¶ 24.  On

September 25, 2009, at the suggestion of Trimble, Harvey formed HCH to raise funds

for the BKF pool.  In an attempt to lure prospective pool participants to HCH, Harvey

repeated Trimble's allegations about the Gladiator system and relayed to potential

investors that Trimble was a successful trader who managed millions of dollars in forex

trading accounts.  *Id.* at ¶ 25.  Between October 2009 and December 2009, Harvey, on

behalf of HCH, raised and pooled approximately $122,500 from eight friends and

business colleagues to trade forex through BKF.  *Id*.

10.      In December 2009, Harvey told Trimble that he wanted to visit Capstone's

office in Utah, where Trimble claimed the Gladiator system was located.  Docket No. 1

at 9-10, ¶ 26.  Although Trimble knew that Capstone did not have an office in Utah, he

nevertheless arranged for a web meeting to introduce Harvey to the Gladiator System.

*Id*.  At this meeting, Josh Christensen, one of Trimble's acquaintances, pretended to be

the head of technology at Capstone and answered Harvey's questions about the

Gladiator system.

11.      In late August 2010, a mutual acquaintance introduced Trimble to Jeffery

Groendyke, the manager of the JG Forex Fund ("JGF").  Docket No. 1 at 10, ¶ 28.

Trimble represented to Groendyke that Capstone could recover any losses suffered by

JGF while trading forex.  Based on Trimble's representations, Groendyke allowed

Capstone to trade the JGF commodity pool and retain any profits earned from trading

6

JGF's accounts after Capstone recouped the amount of JGF's forex trading losses.  In total, JGF, through Groendyke, invested $436,485 with Trimble and BKFCM.  *Id.* at ¶ 29.  However, Trimble did not use the $436,485 provided by Groendyke to trade forex; rather, Trimble misappropriated all but $29,000 of Groendyke's funds.  *Id.*

12.     During Trimble's solicitation of investors between July 2009 and August 2010, as a principal and agent of Capstone and BKFCM, Trimble made the following misrepresentations and omissions of material fact:

a.     Capstone actively manages more than $5 million in forex trading accounts;

b.     Capstone owns the Gladiator system, which was created by one of Capstone's computer programmers who formerly worked for NASA;

c.     The Gladiator system has never had a losing month, is a "machine that prints money," and over time, by using the Gladiator system, BKF would be "a billion dollar fund";

d.     During the last four years, the Gladiator system consistently earned profits of at least 3% per month, while limiting the maximum draw downs in any month to 20% through the use of a hedging strategy that limits the market exposure of the Gladiator system's forex positions;

e.     Capstone received a $20 million offer to purchase the Gladiator system, but turned it down because the Gladiator system was too valuable; and

f.     BKF secured a commitment from Gain Capital, a registered futures commission merchant, to invest $5 million with BKF to trade forex using the Gladiator system.

Docket No. 1 at 8, ¶ 20.

13.     Throughout the relevant period, defendants Capstone and BKFCM accepted a total of $717,000 from BKF pool participants, Docket No. 1 at 9, ¶¶ 23, 30, and $436,485 from Groendyke to trade forex in a Capstone managed account.  *Id.*  In

addition, Trimble, acting as a principal and agent of defendants, knew that his representations about the Gladiator system and forex trading were false and unfounded, but failed to disclose this information to potential investors.  Moreover, Trimble failed to disclose that he had never traded forex for customers prior to July 2009.  Docket No. 1 at 8, ¶ 21.

14.     In July 2011, Trimble admitted to Harvey that: (1) Capstone did not own or create the Gladiator system; (2) Capstone never managed forex trading accounts for any other customers; (3) Capstone never managed accounts that earned consistent profits of 3% per month; (4) Capstone did not have an office in Utah; and (5) Christensen never worked for Capstone.  Docket No. 1 at 10, ¶ 27.

**E.   Defendants' Forex Trading**

15.     In December 2009, Trimble opened an account at MIG Investments S.A. ("MIG"), a forex trading firm located in Neuchatel, Switzerland.  That same month, Trimble transferred $408,000 of the $717,000 from the BKF fund to the MIG bank account.  Docket No. 1 at 11, ¶ 30.  Trimble advised Harvey and Michael Sajdak ("Sajdak"), another participant in BKF, that he would begin trading and operating the BKF funds located in the MIG account on a margined or leveraged basis.  Trimble gave Harvey a password so that Harvey could review the trading activity.

16.     On December 11, 2009, Trimble, as a signatory and owner of the BKF bank account, transferred $309,000 of the BKF funds into an account at OSIRIS FX, a forex trading firm located in Tortola, British Virgin Islands.  Docket No. 1 at 11, ¶ 31.  On February 15, 2010, Trimble, as the principal and agent of Capstone and BKFCM, began trading the account at OSIRIS FX using the Gladiator system.  *Id.*  The

funds located at OSIRIS were traded on a margined or leveraged basis with no obligation to take delivery.

17.     On February 15, 2010, Harvey and Sajdak noticed from a review of account statements from MIG that the forex account had lost 47% of its value.  Docket No. 1 at 11, ¶ 32.  Trimble explained that the losses were due to the poor performance of the Gladiator system.  Despite the losses, Trimble continued to trade BKF's accounts at MIG and OSIRIS FX with the Gladiator system.

18.     Between April and May 2010, Sajdak and Harvey noticed that the forex accounts at both OSIRIS and MIG were performing poorly.  *Id*. at 11-12, ¶ 33.  By the end of May 2010, Harvey and Sajdak asked Trimble to cease trading the MIG and OSIRIS FX accounts and withdraw the remaining balance of $158,656 from both accounts.  On June 25, 2010, MIG transferred $65,586 to the BKF bank account.  In August 2010, OSIRIS FX wired $80,000 to the BKF bank account, and another $8,007 in September 2010.  After removing the funds from the MIG and OSIRIS FX accounts, approximately $129,680 of the BKF pool funds were redistributed to its investors on a pro-rata basis, leaving a $36,639.21 balance.  The balance of $36,639.21 was transferred to the HCH account.

### F.   Defendants Misappropriated Investor Funds

19.     In August 2010, Trimble met with HCH participants and requested that they allow him to invest the remaining $36,639.21 in an attempt to recover the forex trading losses.  Docket No. 1 at 12, ¶ 34.  To persuade HCH investors to allow him to invest the $36,639.21, Trimble offered to execute promissory notes with each HCH investor for the full amount of their investment due and payable on January 15, 2011.

9

The HCH investors allowed Trimble to trade the remaining balance to recover the Gladiator system's losses.  Instead of investing the $36,639.21, Trimble used the funds for personal expenses including food, clothing, rent, and gambling.

20.     Trimble also failed to trade forex with the $436,485 he accepted from Groendyke.  Docket No. 1 at 12, ¶ 35.  Of the $436,485 from Groendyke, Trimble deposited approximately $35,000 into Capstone's bank account in September 2010 and approximately $401,485 into the personal bank account of his wife, Jennifer Trimble (formerly known as Jennifer Geiss).  Trimble then spent $272,000 of the $401,485 from Mrs. Trimble's account on personal expenses, including travel, rent, dining, and gambling.  Trimble paid a law firm $18,600 for a purported real estate venture and returned $29,000 to Groendyke.  None of the funds provided by Groendyke were used to trade forex.

21.     In March 2011, Groendyke asked Trimble what had happened to JGF's funds and Trimble falsely informed him that all of the funds in Capstone's bank account had been frozen by the FBI.  Docket No. 1 at 13, ¶ 36.

## G.   Trimble's Control of BKFCM and Capstone

22.     At all relevant times, Trimble acted as a principal and agent of BKFCM and Capstone.  Moreover, Trimble is the founder, president, and manager of BKFCM and the founder, owner, and president of Capstone.  Docket No. 1 at 13, ¶ 37.  Trimble managed the day-to-day operations of BKFCM and Capstone, and solicited members of the retail public to trade forex both verbally and through Capstone's website.  Trimble was also responsible for conducting all of the forex trading on behalf of BKFCM's pool participants.

10

## II.  ANALYSIS

### A.  CFTC Jurisdiction

Under § 2(c)(2)(C), the CFTC can pursue an action involving forex transactions

that are: (1) offered to or entered into with a person who is not an eligible contract

participant ("ECP"); (2) offered to or entered into on a leveraged basis or financed by

the offeror on a similar basis; and (3) do not result in delivery within two days or create

an enforceable obligation to make or take delivery.  7 U.S.C. § 2(c)(2)(C).  ECPs are

defined in 7 U.S.C. § 1a(18).  The threshold necessary to qualify as an ECP is a

combined net worth of $5,000,000 for a commodity pool or assets exceeding

$10,000,000 for an organization.  The Commodity Futures Trading Commission has

jurisdiction over Trimble's forex transactions because Trimble, Capstone, and BKFCM

are not ECPs under the Act.  *See* 7 U.S.C. § 1a(18); Docket No. 1 at 13, ¶¶ 38-39.

Further, defendants' forex transactions were entered into on a leveraged or margined

basis, meaning that BKF, through Trimble's trades as principal of BKF, only had to

provide a percentage of the value of the forex contracts purchased.  Docket No. 1 at 14,

¶ 40.  Additionally, Trimble's forex transactions did not result in actual delivery of the

contracts within two days or otherwise create an enforceable obligation to make or take

delivery.  *Id*.  Moreover, neither the counterparty to the transactions nor defendants are

one of certain enumerated persons pursuant to 7 U.S.C. § 2(c)(2)(C)(I), (ii).  Therefore,

the Commodity Futures Trading Commission has jurisdiction over defendants' forex

trading.

## B.  Violations of the Act

Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract . . .

7 U.S.C. § 6b(a)(2)(A)-(C).  Sections 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C), prohibit cheating, defrauding, and deception in connection with off-exchange foreign currency ("forex") transactions that occurred on or after June 18, 2008.

Taking the allegations in the complaint as true, the CFTC has shown that defendants violated the Act with the requisite scienter[4] when Trimble, defendants' principal and agent, made false material[5] representations to investors about the

---

[4]The scienter element is established when an individual's conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that defendant must have been aware of the risk.  *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002).

[5]A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."  *R & W Tech. Serv. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000).  Any fact that enables customers to assess independently the risk

capacities of the Gladiator system, the fact that Capstone managed more than $5 million in forex trading accounts, and that Gain Capital had invested $5 million in BKF. The CFTC has also shown that defendants willfully and intentionally misappropriated $36,639.21 from HCH participants and $407,485 from Groendyke.  Misappropriation of customer funds constitutes "willful and blatant fraudulent activity" in violation of Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A) and (C).  *See United States Commodity Futures Trading Comm'n* v. *Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000) (defendants violated Sections 4b(a)(2)(I) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use), *aff'd sub nom Commodity Futures Trading Comm'n v. Baragosh*, 278 F.3d 319 (4th Cir. 2002); *see also Commodity Futures Trading Comm'n v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant violated Section 4b when she misappropriated customer funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to investors, herself, and her family).  Defendants' misrepresentations and misappropriations constitute violations of Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, 7 U.S.C. § 6b(a)(2)(A) and (C).

Capstone and BKFCM are liable as principals for the acts of their agent Trimble. Under § 2(a)(1)(B) of the Act, "[t]he act, omission, or failure of any official, agent or

---

inherent in their investment and the likelihood of profit is a material fact.  *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 110 (2d Cir. 1986).  Here, the representations that the Gladiator system consistently earned returns of 3% and that Gain Capital had promised to invest $5 million in the Gladiator system are representations of the sort that a reasonable investor would consider important when making a decision to invest.

other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. § 2(a)(1)(B).  The facts set forth above demonstrate that, during the relevant period, Trimble acted as an agent of Capstone and BKFCM.  Moreover, the acts, misrepresentations, omissions, and failures of Trimble described above occurred within the scope of his office as the founder, owner and president of Capstone and the founder, principal, and manager of BKFCM. Therefore, Capstone and BKFCM are liable for Trimble's acts, misrepresentations, omissions, and misappropriations pursuant to § 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

### C.  Remedies

#### 1.  *Permanent Injunction Against Defendants*

Section 6c(b) of the Act, 7 U.S.C. § 13a-1(b), provides in pertinent part that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."  The injunctive relief contemplated in this portion of the Act is remedial in nature, designed to prevent injury to the public and to deter illegal conduct. *See Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979). As such, restrictive concepts ordinarily associated with private litigation – such as proof of irreparable injury or inadequacy of other remedies – are not applicable to injunctive relief pursuant to the Act.  *Id*.  Instead, to obtain injunctive relief under the Act a plaintiff must show only two things: (1) that a violation of the Act has occurred; and (2) that

14

there is a reasonable likelihood of future violations.  *Id.*; *Commodity Futures Trading Comm'n v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (noting that the CFTC need not prove irreparable harm or the inadequacy of other remedies); *Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986).

Moreover, in a CFTC enforcement case, the Eleventh Circuit held that a district court's finding of a likelihood of future violations supported an entry of a permanent injunction.  *See Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999).  In this case, defendants' conduct was extensive as they made numerous knowing misrepresentations about the Gladiator system, defendants' ability to trade forex, and presented a module of the Gladiator system through a manufactured internet presentation.  Moreover, defendants misappropriated customer funds which have yet to be repaid to investors.  Therefore, the Court finds that a permanent injunction is appropriate because defendants' previous conduct makes it likely that they could participate in future fraudulent activity in connection with forex trading.  *Sidoti*, 178 F.3d at 1132.

## 2.  *Restitution*

The equitable remedy of restitution under the Act provides that the Court may impose "restitution to persons who have sustained losses proximately caused by [violations of the Act] (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3)(A).  The CFTC's complaint shows that, during the time period from July 2009 through August 2010, Capstone received $436,485 from Groendyke and BKFCM received $715,500 from investors.  Of the $436,485 Capstone received, it returned $29,000 to its

customers.  Additionally, BKFCM returned to its participants $235,585.49 of the $715,500 it received.  Accordingly, the Court orders that Capstone shall pay restitution in the amount of $407,485, plus post-judgment interest and BKFCM shall pay restitution in the amount of $479,914.51, plus post-judgment interest.

### 3.  Disgorgement

Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3)(B), provides that the Court may impose equitable remedies including "disgorgement of gains received in connection with [violations of the Act]."  Disgorgement under the Act is generally "an equitable remedy designed to cure unjust enrichment of the defendant absent consideration of the plaintiff's losses."  *Commodity Futures Trading Comm'n v. Wilshire*, 531 F.3d 1339, 1345 (11th Cir. 2008); *Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76 (3d Cir. 1993) ("A number of courts have held that district courts have the power to order disgorgement as a remedy for violations of the Act").

The Third Circuit has opined that, pursuant to § 13a-1, it is generally improper to grant an award of disgorgement measured in the amount of customer losses.  *Am. Metals Exch. Corp.*, 991 F.2d at 76-77.  According to that court,

> [A]n award of damages in the amount of investor losses may go beyond the scope of a Commodity Exchange Act enforcement proceeding. Absent a hearing to calculate ill-gotten gains, the disgorgement ordered in an amount equal to investor losses could be a penalty assessment.  If investors wish to seek recovery of their losses as a remedy, they are free to do so in an independent civil action against defendants.

*Id*. at 78.  In this case, the CFTC has not shown that its requested amount of disgorgement is separate from the requested award of restitution.  Because the remedy

of disgorgement does not take into consideration victims' losses but focuses on defendants' unjust enrichment, the Court will not impose an award of disgorgement against defendants because the restitution award is sufficient to ensure that defendants will not profit from their unlawful conduct.  *See Am. Bd. of Trade,* 803 F.2d at 1252 (finding that it was not an abuse of discretion under the Act for the district court to order disgorgement based on victims' losses when the CFTC's approximation of unlawfully received profits was not reasonably determinable); *Hunt*, 591 F.2d at 1223 (remanding case to district court to show a clear link between the disgorgement award and defendants' ill-gotten profits).

### 4.   *Civil Monetary Penalties*

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), provides that "the [CFTC] may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the Act or Regulations] a civil penalty."  Pursuant to Section 6c(d)(1)(A) of the Act, 7 U.S.C. § 13a-1(d)(1)(A) for the time period at issue in the case at bar, the civil monetary penalty could not be greater than $140,000 for each violation of the Act that occurred after October 23, 2008[6] "or triple the monetary gain to the person for each violation."  The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent.  *Miller v. Commodity Futures Trading Comm'n*, 197 F.3d 1227, 1236 (9th Cir. 1999).  Moreover, "[i]n evaluating civil penalties under the [Act], [courts]

---

[6]*See* 17 C.F.R. § 143.8(a)(1)(iii)-(iv)(2012) (civil penalty assessed pursuant to Section 6(c) for acts "[c]ommitted on or after October 23, 2008, not more than the greater of $140,000 or triple the monetary gain to such person for each such violation").

have considered the general seriousness of the violation as well as any particular mitigating or aggravating circumstances that exist." *Wilshire*, 531 F.3d at 1346. "Defrauding customers is a violation of the core provisions of the [Act] and 'should be considered very serious.'" *Id*. (quoting *JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557, 1571 (11th Cir. 1995)).

As discussed above, defendants' violations were knowing and continuous. Specifically, defendants knowingly engaged in an illegal scheme by, *inter alia*, (I) misappropriating customers' funds, (ii) fraudulently soliciting hundreds of thousands of dollars from customers for the purported purpose of trading forex, and (iii) providing false information about the Gladiator system. Additionally, the case presents no mitigating facts or circumstances. The CFTC has requested civil monetary penalties against Capstone in the amount of $1,222,455, which represents three times the monetary gain of $407,485 that Capstone received as a result of its violations of the Act. The CFTC has also requested civil monetary penalties against BKFCM in the amount of $109,917.63, which represents three times the monetary gain of $36,639.21 that BKFCM received as a result of its violations of the Act. Based on the allegations in the complaint, the Court finds that a civil monetary penalty against Capstone in the amount of $1,222,455 and against BKFCM in the amount of $109,917.63 is justified. The amount of the civil monetary penalties is appropriate given the repeated and egregious nature of defendants' fraudulent scheme. *See Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1111-12 (11th Cir. 2008) (holding that the Act provides

18

for multiple civil monetary penalties for multiple violations even when those multiple violations are set forth in a single count).

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Entry of Final Judgment by Default, Order for Permanent Injunction and Other Ancillary Relief against Defendants Capstone FX Quantitative Analysis, Inc., and Beekeepers Fund Capital Management, LLC [Docket No. 34] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that Intervenor James Harvey's Motion to Modify Proposed Order for Entry of Final Judgment by Default [Docket No. 36] is **DENIED** as moot.  It is further

**ORDERED** that, pursuant to Section 6c(b) of the Act, as amended, 7 U.S.C. § 13a-1(b), defendants Capstone Quantitative Analysis, Inc. ("Capstone") and Beekeepers Fund Capital Management, LLC ("BKFCM") are permanently restrained, enjoined, and prohibited, until further order of the Court, from directly or indirectly:

A.   Cheating, defrauding or willfully deceiving, or attempting to cheat, defraud or willfully deceive, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market, in violation of Sections 4b(a)(2)(A) and (C) of the Act as amended, 7 U.S.C. § 6b(a)(2)(A) and (C);

B.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

C.   Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)) ("commodity options"), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(I) of the Act, as amended, 7 U.S.C.

19

§§ 2(c)(2)(B) and 2(c)(2)(C)(I)) ("forex contracts") for their personal accounts or for any accounts in which they have a direct or indirect interest;

D.    Having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

E.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

F.    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

G.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and/or

H.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

It is further

**ORDERED** that, pursuant to Section 6c(d) of the Act, as amended, 7 U.S.C. § 13a-1(d)(3)(A), Capstone shall pay restitution in the amount of $407,485 ("Capstone Restitution Obligation"), plus post-judgment interest.  Post-judgment interest shall accrue commencing on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.  It is further

**ORDERED** that, pursuant to Section 6c(d) of the Act, as amended, 7 U.S.C.

§ 13a-1(d)(3)(A), BKFCM shall pay restitution in the amount of $479,914.51 ("BKFCM

Restitution Obligation"), plus post-judgment interest.  Post-judgment interest shall

accrue commencing on the date of entry of this Order and shall be determined by using

the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C.

§ 1961.  It is further

**ORDERED** that the National Futures Association ("NFA") is appointed as Monitor

to effect payment by Capstone and BKFCM and the distribution of restitution.  The

Monitor shall collect restitution payments from Capstone and BKFCM and make

distributions to defendants' customers.  Because the Monitor is acting as an officer of

the Court in performing these services, the NFA shall not be liable for any action or

inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

Defendants shall make distributions on restitution as set forth below:

A.    Capstone shall make Restitution Obligation payments under this Order to the Monitor in the name of the "Capstone Customers' Restitution Fund," and BKFCM shall make Restitution Obligation payments under this Order to the Monitor in the name of the "BKF Participants' Restitution Fund." Capstone and BKFCM shall send such restitution payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order to the Office of Administration with a cover letter that identifies the paying defendant, the case name, docket number, and the name of this Court to:

    Office of Administration
    National Futures Association
    300 South Riverside Plaza, Suite 1800
    Chicago, Illinois 60606;

B.    Defendants Capstone and BKFCM shall simultaneously transmit copies of the cover letter and form of payment to the Chief Financial Officer and the Director of the Division of Enforcement at:

21

Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW, Washington, D.C. 20581;

C.  The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of funds in an equitable fashion to Capstone's customers and BKFCM's pool participants identified by the CFTC or may defer distribution until such time as the Monitor may deem appropriate.  In the event that the amount of Restitution Obligation payments made to the Monitor are of a de minimis nature, such that the Monitor determines that the administrative costs of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for the civil monetary penalty obligation as set forth below;

D.  Capstone and BKFCM shall cooperate with the Monitor as appropriate and provide such information as the Monitor deems necessary and appropriate to identify Capstone's customers and BKFCM's pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Capstone and BKFCM shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward their respective Restitution Obligation;

E.  The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Capstone's customers and BKFCM's pool participants during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer at:

Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW, Washington, D.C. 20581.

F.  The amounts payable to each customer or pool participant pursuant to this Order shall not limit the ability of that customer or pool participant from proving that a greater amount is owed from Capstone or BKFCM or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer or pool participant that exist under federal, state, or common law;

22

G.    Pursuant to Fed. R. Civ. P. 71, each customer of Capstone and pool participant of BKFCM who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by defendants Capstone and BKFCM to ensure compliance with any provision of this Order, and to hold defendants Capstone and BKFCM in contempt for any violations of any provision of this Order;

H.    To the extent that funds accrue to the U.S. Treasury for satisfaction of defendants' Restitution Obligations, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in paragraphs C and E of this Order;

I.    Upon being served with copies of this Order by the CFTC, the asset freeze provision of the Court's Preliminary Injunction Order [Docket No. 79] against defendants Capstone and BKFCM shall no longer be in effect, but only as to defendants Capstone and BKFCM.  The asset freeze provision in the preliminary injunction order shall continue as to Trimble in this action.  The financial institutions and other entities holding frozen funds of Capstone and BKFCM shall tender the funds to the Monitor. These funds shall be distributed to customers as explained above.  At no time during the liquidation, release, and/or wire transfer of these funds pursuant to this Order shall Capstone and BKFCM, any individual acting, or purporting to act on their behalf as agent or employee, or the other defendant in this action (Trimble, or any individual acting, or purporting to act, on behalf of Trimble and/or Capstone and BKFCM) be afforded any access to, or be provided with, any funds from these accounts. Defendants Capstone and BKFCM and all banks and financial institutions subject to this Order, shall cooperate fully and expeditiously with the CFTC and the Monitor in the liquidation, release, and wire of these funds.

It is further

**ORDERED** that, pursuant to Section 6c(d) of the Act, as amended, 7 U.S.C.

§ 13a-1(d)(1)(A), defendant Capstone shall pay a civil monetary penalty ("CMP

Obligation") of $1,222,455, plus post-judgment interest.  Post-judgment interest shall

accrue on the CMP Obligation beginning on the date of entry of this Order and shall be

determined by using the Treasury Bill rate prevailing on the date of this Order pursuant

to 28 U.S.C. § 1961.  It is further

**ORDERED** that, pursuant to Section 6c(d) of the Act, as amended, 7 U.S.C. § 13a-1(d)(1)(A), defendant BKFCM shall pay a CMP Obligation of $109,917.63, plus post-judgment interest.  Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961.  It is further

**ORDERED** that defendants Capstone and BKFCM shall pay their respective CMP Obligations by electronic funds transfer, or by U.S. Postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made by electronic funds transfer, Capstone and BKFCM shall contact Linda Zurhorst or her successor at the address listed below to receive payment instructions.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables - AMZ 340
> E-mail Box:  9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644.

It is further

**ORDERED** that defendants Capstone and BKFCM shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer and the Director for the Division of Enforcement at:

Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581.

It is further

**ORDERED** that payments made by defendants Capstone and BKFCM pursuant to this Order shall first be applied to satisfy their respective Restitution Obligations. After satisfaction of the Restitution Obligations, payments by Capstone and BKFCM pursuant to this Order shall be applied to satisfy their CMP Obligations.  It is further

**ORDERED** that any acceptance by the Commission and/or Monitor of partial payment of the Restitution Obligations or CMP Obligations shall not be deemed a waiver of Capstone and BKFCM's respective requirements to make further payments pursuant to this Order, or a waiver of the Commission's right to compel payment of any remaining balance.  It is further

**ORDERED** that Capstone and BKFCM shall immediately notify the Commission and Monitor if they make or have previously made an agreement with any customer obligating either Capstone or BKFCM, whether jointly and/or severally, to make payments outside this Order.  Defendants Capstone and BKFCM shall also provide immediate evidence to the Commission and the Monitor of any payments made pursuant to such agreement.  Upon being notified of any payments made by Capstone and BKFCM to customers outside of this Order, and receiving evidence of such payments, the Monitor will have the right, but not the obligation, to reduce and offset the distribution of funds from the Restitution Obligations to those specified customer(s) and

to make any other changes in the restitution distribution schedule that the Monitor shall deem appropriate.  It is further

**ORDERED** that Capstone and BKFCM shall not transfer or cause others to transfer funds or other property to the custody, possession, or control of any other person for the purpose of concealing such funds from the Court, the CFTC or any customer until Capstone's and BKFCM's respective Restitution Obligations and CMP Obligations have been paid in full.  It is further

**ORDERED** that all notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, and shall reference the name and docket number of this action, as follows:

a.  Notice to the Commission:
Associate Director
Division of Enforcement - Central Region
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661

b.  Notice to the Monitor:
Vice President, Compliance
National Futures Association
300 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606; and

c.  Notice to Capstone and BKFCM:
Attention Nicholas Trimble
150 W. 9th Avenue, Unit 4305
Denver, Colorado 80204
(VIA UPS and E-mail:trimble.nick@gmail.com)

It is further

**ORDERED** that judgment shall enter in favor of plaintiff U.S. Commodity Futures Trading Commission and against defendants Capstone Quantitative Analysis, Inc. and Beekeepers Fund Capital Management, LLC.

DATED January 28, 2013.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge